UNITED STATES DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
NATIONAL APPEALS DIVISION

In the matter of )
)
JOC FARMS, LLC )
)
and ) Case No. 2011S000349
)
RISK MANAGEMENT AGENCY )

## APPEAL DETERMINATION

Joseph Briley, Jr., Manager (Manager) of JOC Farms, LLC (Appellant) filed an appeal challenging a Risk Management Agency (RMA or Agency) adverse decision dated February 9, 2011. RMA administers programs of the Federal Crop Insurance Corporation (FCIC). In its decision, RMA concluded uninsured causes contributed to the loss of production and the quality of Appellant's 2009 tobacco crop. RMA argues the uninsured causes include Appellant's failure to apply the correct chemicals for the prevention of Black Shank and a failure to timely harvest portions of its tobacco crop. In addition, RMA found the amount of insurable acres Appellant reported in the insurance policy were incorrect. RMA directed the reinsured/insurance company (also referred to as approved insurance provider (AIP)), Rural Community Insurance Services (RCIS), to adjust Appellant's claim to omit the uninsured losses and to reflect the correct acreage.

Appellant asserts RMA's decision contains error because RMA did not have evidence that Blank Shank resulted in losses to Appellant's 2009 tobacco crop. Appellant also argues it used the locally accepted procedures to treat against this disease. In addition, Appellant asserts RMA erred in concluding Appellant's management decisions resulted in uninsured losses due to untimely harvest of its tobacco crop. Appellant asserts excessive rainfall kept Appellant from harvesting the crop. Appellant further argues RMA erred in accepting RCIS's determination of the number of insured acres. Appellant argues the resulting indemnity payment was therefore incorrect.

At Appellant's request, I held an in-person hearing on April 14, 2011. I continued the hearing on May 5, 2011, and completed the hearing by telephone on May 24, 2011. I left the record open to allow the parties to submit additional documents and to provide written closing statements. Appellant and RMA provided post-hearing documents and I marked these documents as Appellant's Post-Hearing Exhibit A and Agency's Post-Hearing Exhibit 1. Appellant also provided a reply to Agency's Post-Hearing Exhibit 1, and I marked that document as Appellant's Post-Hearing Exhibit B. I closed the record on June 13, 2011. Based on the evidence and the arguments the parties submitted, and the program regulations that apply to this situation, I



JOC Farms, LLC
Case No. 2011S000349

conclude that RMA's decision contains error, but find the error is not material. I therefore uphold the Agency's decision that uninsured causes contributed to the loss of production and quality of Appellant's 2009 tobacco crop. The rationale for my decision follows.

## PROCEDURAL HISTORY

Appellant made a timely request for the issuance of subpoenas for two necessary witnesses. I submitted that request for the NAD Director's review and approval. Before receiving a reply on Appellant's request, Appellant's Representative received notification that the witnesses, a North Carolina (NC) State Cooperative Extension Agent (Extension Agent) and a NC State University (NCSU) Plant Pathologist, would voluntarily attend the hearing scheduled for April 14, 2011. The witnesses, however, did not attend the hearing. Appellant renewed its request for subpoenas at the hearing. The NAD Director approved issuance of the subpoenas and the witnesses attended and testified at the hearing session held on May 5, 2011.

## BACKGROUND

On June 2, 2005, RMA issued instructions to AIPs in its Manager's Bulletin MGR-05-009 regarding its option to participate in large claims. According to MGR-05-009, upon receiving notice of a potential claim on an eligible crop insurance contract where the anticipated production losses or indemnity payment exceeds $500,000, the AIP must notify the RMA Regional Office (RO) in whose area the insured acreage is located. RMA may then elect to participate in loss determinations or review the actions of the AIP taken in the settlement of the claim before the AIP issues an indemnity payment. The purpose of RMA's participation is to ensure processing of claims complies with 7 United States Code (U.S.C.) 1501 *et seq*. See 2005 Standard Reinsurance Agreement and Manager's Bulletins MGR-05-009 and MGR-05-009.1 (http://www.rma.usda.gov/news/managers/2005/PDF/mgr-05-009.pdf; and /mgr-05-009.1.pdf).

## STATEMENT OF THE ISSUE

I had to determine if RMA correctly applied its regulations for its decision that Appellant had uninsurable causes of loss to its 2009 tobacco crop. To make this determination, I had to answer the following questions:

1. Did Appellant show Agency erred in its decision because it had insurable losses to its 2009 tobacco crop due to excessive rain?

2. Did Appellant show Agency erred in deciding Appellant had uninsurable causes of loss because it failed to use the appropriate disease control methods to prevent Black Shank?

3. Did Appellant show Agency erred in its decision because it had insurable losses to its 2009 tobacco crop due to naturally occurring disease?

2

4. Did Appellant show Agency erred in its decision when it included the appraised unharvested tobacco in the production to count?

5. Did Appellant show Agency erred in its decision because it accepted RCIS's recalculation of the number of insured acres?

6. Did Appellant show the indemnity payment it received from RCIS was in error?

**FINDINGS OF FACT (FOF)**

1. Appellant is a limited liability company (LLC). Manager has a 98 percent interest in the LLC. AgCarolina (Interested Party) is a secondary payee for any indemnity payment Appellant may receive. (Agency Record, page 20, 213, 461-473)

2. On February 15, 2008, Appellant submitted its initial tobacco insurance application. For the 2009 crop year, Appellant elected 85 percent coverage level with Enterprise Units (EU) and 100 percent price election, for flue-cured tobacco in Beaufort County, NC (County), under the Guaranteed Tobacco Plan of Insurance, policy number MP-32-090-793527 (Policy; also identified as NC-090-793527 and 2009- NC-090-793527). (Agency Record, pages 19, 20, 25, 41, 129-151, 243-244)

3. Appellant reported to RMA that it planted its crops between April 21, 2009, and May 3, 2009. Appellant planted three varieties of tobacco on his farms in County (2009 Crop). The varieties of tobacco Appellant planted included K326, CC27, and CC35. Appellant also planted tobacco in Pitt County, NC (Other County) in 2009. (Agency Record, pages 4-10, 19, 20, 25, 41, 129-151, 243-244)

4. Typically, harvesting of tobacco occurs three times; first taking the lowest leaves, then the middle leaves, and finally the top leaves. Appellant harvested the leaves mechanically using large harvesting equipment. Appellant attempted to start harvesting its crops in County during the first week of July 2009. Appellant moved the harvesting equipment to Other County because rain in County resulted in the fields being too wet to enter with the heavy equipment. It took approximately two weeks to complete the harvest of tobacco in Other County before Appellant returned the equipment to harvest its crops in County. Appellant concedes that during these two weeks the fields in County were dry enough to start harvesting. Appellant delayed the harvest in County because of the time and expense associated with moving its harvesting equipment from Other County. Appellant also admits it attempted to harvest where it could obtain higher poundage and higher value crop. Appellant completed harvest of its tobacco crop before October 10, 2009. (Agency Record, pages 8-10, 18, 456; April 14, 2011, Hearing Audio, Track 1, 58:15-1:00:51, Track 3, 2:34-2:44, 20:00-25:17, 38:20-43:14; Appellant's Post-Hearing Exhibit B)

5. On September 1, 2009, Appellant notified RCIS that it had losses to its 2009 Crop. Appellant attributed its losses to plant disease. (Agency Record, pages 12, 41, 129, 319; Hearing Audio for April 14, 2011, Track 3, 2:44-5:00)

3

JOC Farms, LLC
Case No. 2011S000349

6. On September 2, 2009, an RCIS loss adjuster began inspection of the tobacco stalks remaining in Appellant's fields. The RCIS loss adjuster authorized Appellant to begin mowing the stalks. On September 3, 2009, Agency's Regional Office in Raleigh, NC (RRO) notified RCIS that it elected to participate in the loss determination for Appellant's tobacco policy. On the same day, an RCIS insurance adjuster advised Appellant of RRO's participation and advised Appellant to stop all mowing of tobacco stalks covered by the policy. Appellant mowed Farm Serial Numbers (FSN) 7877, 1664, and 8361, before it received notice to halt all mowing. (Agency Record, pages 17, 18, 41, 129; May 5, 2011, Hearing Audio, Track 2, 2:44:00-2:46:31)

7. Representatives from RCIS and RMA made field visits on September 11, 14, 15, 22, and 23, 2009, and October 23, 2009. During their field visits, the representatives observed that Appellant had not harvested the lower four to six tobacco leaves and the leaves were dead (also referred to as burned-up). Based on their observations, they decided to complete a burned leaf count and stalk count on Appellant's harvested and un-harvested tobacco. Representatives also noted 15 acres of tobacco Appellant did not report for the 2009 FSA acreage reports and that some acres were incorrectly identified as inside or outside of County. (Agency Record, pages 17-39, 129-151, 214-228; Agency Hearing Exhibit 3, pages 4-11; May 5, 2011, Hearing Audio, Track 2, 2:23:26-2:30:03)

8. Based on the observations RMA and RCIS made during the field visits, the RCIS loss adjuster informed Manager that he needed to get an agricultural expert to come out to the farms and confirm the presence of plant disease. Manager contacted Extension Agent on September 15, 2009. Extension Agent told Manager that he was about to leave the area for three weeks and if Manager needed someone to immediately review his crops, he could contact the extension agent for Other County. Manager arranged to have the County Extension Agent come and review his crops when he returned in October 2009. (Agency Record, pages 17-39, 129-151, 214-228; Agency Hearing Exhibit 3, pages 4-11; May 5, 2011, Hearing Audio, Track 2, 13:25-14:36; 2:23:26-2:30:03)

9. RMA and RCIS personnel observed un-harvested, burned-up lower tobacco leaves on stalks for fields in FSN 7718, 7877, 9172, 8245, 8251, 8854, 8861, 9166, 9167, 9173, 9325, 9326, and 9327. Fields in FSN 7718, 8251, 8245, 8854, 9166, 9167, 9172, 9325, 9326, and 9327, showed evidence of harvesting of the tobacco leaves all at one time, with no evidence of previous harvesting having taken place. (Agency Record, pages 17-39; May 5, 2011, Hearing Audio, Track 2, 2:23:26-2:44:00)

10. During the field visits, two RCIS loss adjusters used four-wheelers and a handheld Global Positioning System (GPS) unit to complete measurement of the tobacco acreage. Appellant used this same method and a similar unit in determining the acreage reported for its insurance coverage. The acreage Appellant reported to RCIS for the Policy totaled 584.40 acres and the RCIS measured acres totaled 567.79. Appellant's measurements resulted in 16.61 more acres than RCIS's measurements. (Agency Record, pages 17-39, 327; Agency Hearing Exhibit 3, 12-15; Appellant's Exhibit B and D; Hearing Audio for April 14, 2011, Track 1, 1:02:47-1:15:05, Track 3, 5:50-6:10, 18:50-19:14)

4

Case 4:12-cv-00186-D   Document 1-1   Filed 08/09/12   Page 4 of 17

JOC Farms, LLC
Case No. 2011S000349

11. On October 10, 2009, Extension Agent accompanied Manager to review FSN 8854, 8856, 7718, 8245, 8861, 8859, and 1907 (this last FSN is in Other County and not part of this claim). Extension Agent collected samples for NCSU Plant Disease and Insect Clinic (Plant Disease Clinic) testing. Extension Agent's visit occurred after Appellant completed all harvesting of its 2009 Crop. Based on an inspection of the stalks and plants that remained in the fields, Extension Agent concluded Appellant's crop showed a 10 to 50 percent stand loss due to disease. In his October 15, 2009, letter to Appellant, Extension Agent identified Tomato Spotted Wilt Virus, Black Shank, Brown Spot, and Tobacco Mosaic Virus, as the diseases present in Appellant's crop. Appellant conceded that the Extension Agent was not a plant pathologist and offered only an opinion of the diseases present. The NCSU Plant Disease Clinic completed testing for the identified diseases, but only confirmed the presence of Tobacco Mosaic Virus in one of the samples Extension Agent provided. The NCSU Plant Disease Clinic also noted that other leaves were very senescent (old) with lesions of Brown Spot. (Agency Record, pages 12-16; Appellant's Exhibit A; April 14, 2011, Hearing Audio, Track 2, 36:50-51-50; Track 3, 30:20-30:50; May 5, 2011, Hearing Audio, Track 1, 35:00-1:42:30, Track 2, 8:55- 18:40)

12. On October 23, 2009, the RMA and RCIS representatives made one final field visit to obtain tobacco stalk samples from Appellant's County farms to send to the NCSU Plant Disease Clinic for analysis. RMA found it necessary to collect additional samples because the Extension Agent comingled the samples he collected from County with samples from Other County. RMA collected its samples from fields in FSN 8245, 8251, 8854, 8856, 8857, 8861, 7718, 7284, 9166, 9172, 9173, 9325, 9326, and 9327. On October 23, 2009, RMA gave Appellant permission to destroy all remaining stalks. (Agency Record, pages 17-39; Agency Hearing Exhibit 3, page 4)

13. On October 26, 2009, RMA received a response from the NCSU Plant Disease Clinic confirming only the presence of Granville Wilt. The NCSU Plant Pathologist indicated that the end of October is a very late time in the season to submit a tobacco sample for accurate diagnosis, and providing only dead stalks made the analysis more difficult and less accurate. Black Shank was not isolated from any of the samples. (Agency Record, pages 17-39; Appellant's Exhibit A; May 5, 2011, Hearing Audio, Track 1, 35:00-1:42:30, 1:48:13-

14. On November 10, 2009, Appellant and RCIS changed the cause of loss. According to the Combination Production/Appraisal Worksheets RCIS completed, 60 percent of Appellant's losses resulted from plant disease and 40 percent of the losses resulted from excess precipitation. Testimony on behalf of Appellant supported this change in reporting of its causes of loss. (Agency Record, pages 17-39, 41, 229-231)

15. On April 15, 2010, the RMA RRO issued its final decision on Appellant's claim for indemnity. According to the RRO's decision, it found Appellant's lack of timely harvest and improper application of fungicides contributed to uninsured causes of loss. It did not find support in weather data for Appellant's claim of excessive rain as an insurable cause of loss. The RRO noted RCIS incorrectly calculated Appellant's Actual Production History (APH). The RRO also concluded Appellant did not have adequate barn capacity to cure its entire

5

JOC Farms, LLC
Case No. 2011S000349

tobacco crop. Further, the RRO decision concluded Appellant's total production to count exceeded its production guarantee. Appellant sold 765,694 pounds of tobacco, which the RRO combined with production lost due to uninsured causes of 256,248 pounds, for a total production to count of 1,021,942. Appellant's guarantee totaled 974,325 pounds. Based on this finding, the RRO concluded Appellant would not receive any indemnity payment for its 2009 loss claim. The decision notified Appellant that it could request a further RMA administrative review, mediation, or an appeal with the National Appeals Division (NAD). (Agency Record, pages 17-39)

16. On May 26, 2010, RMA confirmed that it received Appellant's request for administrative review and mediation. The parties engaged in mediation on May 28, 2010, and again on June 17, 2010. (Agency Record, pages 40, 69: Pre-Hearing, Track 1, 16:06-16:20)

17. On June 30, 2010, after the conclusion of mediation, the RRO issued another (almost identical) final decision to Appellant. This decision is different in that it directly addresses each disease identified in its decision of April 15, 2010, and clarifies the basis for its finding that Appellant's treatment was inadequate to prevent the identified diseases. The RRO removed Target Spot from the identified diseases. The RRO decision identified untimely harvest and failure to purchase and apply proper fungicides as uninsured causes of loss. The RRO concluded Appellant did not have any insurable causes of loss to its 2009 Crop. The decision notified Appellant that it could request a further RMA administrative review, that the option for mediation was exhausted, and that it could request an appeal with NAD. (Agency Record, pages 41-67)

18. On July 30, 2010, Appellant requested further RMA administrative review. On February 9, 2011, RMA's Deputy Administrator for Insurance Services issued to Appellant RMA's administrative review (2011 Decision; also referred to as the Agency's adverse decision). In its 2011 Decision, RMA concluded Appellant used sufficient disease control measures for management of Tomato Spotted Wilt Virus and Tobacco Mosaic Virus. RMA concluded Appellant did not properly treat against Black Shank on the less resistant tobacco varieties of CC27 and K326. It also concluded Appellant's decision to delay harvest and failure to remove the lower leaves resulted in a prevalence of Brown Spot and negatively affected Appellant's tobacco harvest. The 2011 Decision further states that although insurable losses due to this disease existed, it could not determine to what extent Appellant's management decision to delay harvesting intensified the spread of Brown Spot. The 2011 Decision also states it did not uphold the RMA RRO's decision that barn capacity was a determining factor that contributed to loss. (Agency Record, pages 68-151)

19. RMA's 2011 Decision further states Appellant's decision not to harvest the less desirable leaves and return to other fields to harvest is not an insurable loss due to naturally occurring events. According to the 2011 Decision, the weather information indicated rainfall did occur during the harvest season, however, there were a number of consecutive days with no precipitation that would have allowed continued harvest. In conclusion, RMA directed RCIS to include the identified un-harvested tobacco and the misreported and unreported acres in the production to count. RMA also directed RCIS to make a quality adjustment to Appellant's harvested tobacco, but not to the un-harvested, appraised tobacco. RMA does

6

JOC Farms, LLC
Case No. 2011S000349

not make final payment calculations. RCIS is solely responsible for payment calculations and the disbursement of indemnity payments to its policyholders. (Agency Record, pages 129-151, 214-232; May 5, 2011, Hearing Audio, Track 3, 19:00-19:14; Hearing Audio, Track 1, 2:28:09-2:31:58, Track 2, 1:02-45:30)

20. RCIS paid Appellant $100,907.00 for qualifying losses attributed to disease and $2,889.32 for interest on the amount of the indemnity payment. Representatives for RMA and RCIS testified the qualifying losses resulted from the presence of Black Shank in fields planted with tobacco variety CC35; in other words, those fields planted with a variety of tobacco that is resistant to Black Shank. (Agency Record, pages 152, 438-441; Appellant's Exhibit E)

21. The 2009 weather for County showed normal to below normal rainfall for the months of June, August, and September; July was slightly above normal. On July 6 and 16, 2009, Appellant's farm could have received almost an inch of rain. Periods of no rain, or minimal rain, followed. (Agency Record, pages 153-212, Agency Hearing Exhibits 1 and 2, Agency Post-Hearing Exhibit 1; April 14, 2011, Hearing Audio, Track 1, 1:21:40-1:35:42; Track 2, 12:47-27:10; Track 3, 8:53-16:27; 46:00-48:15; May 5, 2011, Hearing Audio, Track 1, 35:00-1:42:30, 1:48:13-1:53:51, 2:02:22-2:10:03, 2:14:00-2:27:10; 2:29:28-2:30:27; Track 2, 28:00-28:11, 15:39-15:47, 50:00-50:50)

22. Although there were two days in July 2009 that County received an inch or more of rain, the weather data and report RMA's Geospatial Climatologist completed refutes Appellant's claim that excessive rains prevented it from harvesting its crop. An average tobacco crop can remove one to two inches of water each week from the soil. According to the Extension Agent, the sporadic rain events in County in July 2009 caused a brief delay in harvesting. The duration of the delay ranged anywhere from one day to maybe as much as seven days. Excessive rain did not keep Appellant from harvesting its crops. Excessive moisture was not a major factor in causing the spread of disease. No other farm in the immediate area surrounding Appellant's farms noted losses from excessive precipitation. (Agency Record, pages 153-212, Agency Hearing Exhibits 1 and 2, Agency Post-Hearing Exhibit 1; May 5, 2011, Hearing Audio, Track 2, 55:18-55:48, 1:24:30-1:35:06, 1:57:33-2:01:50)

23. Black Shank did not cause reportable losses to Appellant's 2009 tobacco crop. Appellant used the normal and accepted practices and chemicals to treat against Black Shank. The NCSU Plant Pathologist confirmed that she could find no evidence that Black Shank was present in Appellant's 2009 Crop. The NCSU Plant Pathologist testified that excessive spring rains followed with excessive heat, not late summer rains, promotes the spread of Granville Wilt and Black Shank. Those conditions were not present in County in 2009. Black Shank kills the entire plant, meaning it affects pounds, not quality. Extension Agent testified no other tobacco growers reported extensive disease outbreaks in County in 2009. (Agency Record, pages 246-316; Appellant's Exhibit A; April 14, 2011, Hearing Audio, Track 1, 1:21:40-1:35:42; Track 2, 12:47-27:10; Track 3, 8:53-16:27; 46:00-48:15; May 5, 2011, Hearing Audio, Track 1, 35:00-1:42:30, 1:48:13-1:53:51, 2:02:22-2:10:03, 2:14:00-2:27:10; 2:29:28-2:30:27; Track 2, 28:00-28:11, 15:39-15:47, 50:00-50:50, 55:18-55:48, 1:24:30-1:35:06, 1:57:33-2:01:50)

7

JOC Farms, LLC
Case No. 2011S000349

24. Appellant's losses resulted from a failure to timely harvest its tobacco crop in County, which resulted in dead tobacco leaves remaining on the stalks affecting both production and quality. In reviewing RMA's photographs of Appellant's crops, the NCSU Plant Pathologist testified she observed senescence, in which the leaves are old and show liaisons or brown spots on the leaves. Extension Agent agreed with her statement. The NCSU Plant Pathologist commented that she did not understand why Appellant did not complete an earlier harvesting of these leaves. Extension Agent testified that by September 22, 2009, 100 percent of the producers in County should have completed their first harvest of the lower leaves for their tobacco crops. RMA's observations that lower leaves remained in the fields for Appellant's tobacco plants on this date is document in FOF 7 and 9. (Agency Record, pages 17-39, 453-456; April 14, 2011, Hearing Track 3, 19:14-32:00, 34:50-48:15; May 5, 2011, Hearing Audio, Track 1, 2:19:14-2:24:18; Track 2, 50:00-56:28; Agency Post-Hearing Exhibit 1)

25. RMA admitted RCIS incorrectly calculated Appellant's Actual Production History (APH), but that the error was advantageous to Appellant. Appellant did not address APH in this appeal. (Agency Record, pages 17-39, 41-67, 129-151; Agency Post-Hearing Exhibit 1, page 24; May 24, 2011, Hearing Audio, Track 1, 14:20-1:03:50)

**DISCUSSION**

Part 11 of Title 7 of the Code of Federal Regulations (7 C.F.R.) governs the appeal. Seven C.F.R. § 457.8 (Basic Provisions), 7 C.F.R. § 400 (General Administrative Regulations), and the Federal Crop Insurance Guaranteed Tobacco Crop Provisions (Crop Provisions), govern the issues on appeal. FCIC-25010 "Loss Adjustment Manual (LAM) Standards Handbook 2009 and Succeeding Crop Years" and FCIC-25520 "Tobacco (Guaranteed Production) Loss Adjustment Standards Handbook 2000 and Succeeding Crop Years" contain the FCIC approved loss adjustment standards. As previously stated, RMA elected to participate in making the loss determination for Appellant's claim under the authority of the 2005 Standard Reinsurance Agreement and Manager's Bulletins MGR-05-009 and MGR-05-009.1.

According to Provision 10 of the Crop Provisions, and in accordance with section 12 of the Basic Provisions, insurance is provided only against the following causes of loss that occur during the insurance period: (a) Adverse weather conditions; (b) Fire; (c) Insects, but not damage due to insufficient or improper application of pest control measures; (d) Plant disease, but not damage due to insufficient or improper application of disease control measures; (e) Wildlife; (f) Earthquakes; (g) Volcanic eruption; or (h) failure of the irrigation water supply if caused by peril specified in section 10(a) through (g) that occurs during the insurance period. In the current instance, Appellant asserts naturally occurring plant disease and adverse weather conditions caused its losses.

**Did Appellant show Agency erred in its decision because it had insurable losses to its 2009 tobacco crop due to excessive rain? No.**

Excessive rain did not cause losses to Appellant's 2009 tobacco crop. The evidence, including Manager's testimony, supports RMA's conclusion that Appellant's failure to timely harvest the

8

JOC Farms, LLC
Case No. 2011S000349

tobacco crop caused the crop losses [FOF 4, 7, 9, 21, 22, and 24). Section 12 of the Basic
Provisions states the insurance provided is against only unavoidable loss caused by specific
causes of loss as contained in the Crop Provisions. Damage resulting from negligence,
mismanagement, or wrongdoing is not covered. In addition, section 12 of the Basic Provisions
states losses due to the failure to follow recognized good farming practices for the insured crop
are not covered.

Appellant attempted to start harvesting its crops in County during the first week of July 2009.
Appellant moved the harvesting equipment to Other County because rain in County resulted in
the fields being too wet to enter with the heavy equipment. It took approximately two weeks to
complete the harvest of tobacco in Other County before Appellant returned the equipment to
harvest its crops in County. Appellant concedes that during this two weeks the fields in County
were dry enough to start harvesting, but moving the large tobacco harvesting equipment is time
consuming and costly. Appellant also admits it attempted to harvest where it could obtain higher
poundage and higher value crop [FOF 4]. During field visits in September 2009, RMA and
RCIS personnel observed un-harvested, burned-up lower tobacco leaves on stalks remaining in
Appellant's fields. They also observed the harvesting of all of the tobacco leaves at one time in
several fields, with no evidence of previous harvesting having taken place [FOF 7, 9].

RMA provided expert testimony and weather data refuting Appellant's claim that *excessive* rain
occurred in County and that these rains caused its inability to harvest [FOF 24]. Although there
were two days in July 2009 that County received an inch or more of rain, the weather data and
report a Geospatial Climatologist completed do not support Appellant's claim that excessive
rains prevented it from harvesting its crop. An average tobacco crop can remove one to two
inches of water each week from the soil. No other farm in the immediate area surrounding
Appellant's farms noted losses from excessive precipitation [FOF 21, 22]. Appellant offered no
other evidence, other than Manager's testimony and the testimony of the Extension Agent, that
rain affected Appellant ability to harvest its crops. According to the Extension Agent, the
sporadic rain events in County in July 2009 caused a brief delay in harvesting. The duration of
the delay ranged anywhere from one day to maybe as much as seven days [FOF 22]. In
reviewing RMA's photographs of Appellant's crops the NCSU Plant Pathologist testified she
observed senescence, in which the leaves are old and show liaisons or brown spots on the leaves.
Extension Agent agreed with her statement. The NCSU Plant Pathologist commented that she
did not understand why Appellant did not complete an earlier harvesting of these leaves.
Extension Agent testified that by September 22, 2009, 100 percent of the producers in County
should have completed their first harvest of the lower leaves for their tobacco crops [FOF 24].
However, as already indicated above, RMA and RCIS personnel observed both un-harvested,
burned-up lower tobacco leaves on stalks and harvesting of all of the tobacco leaves at one time
in several fields, with no evidence of previous harvesting having taken place during its
September 2009 field visits to Appellant's fields [FOF 7, 9].

Appellant's losses resulted from a failure to timely harvest its tobacco crop in County, which
resulted in dead tobacco leaves remaining on the stalks affecting both production and quality
[FOF 24].

9

I conclude Appellant did not show any of its losses resulted from insurable losses due to excessive rain.

**Did Appellant show Agency erred in deciding Appellant had an uninsurable cause of loss because it failed to use the appropriate disease control methods to prevent Black Shank? Yes.**

The evidence establishes that Appellant used the normally accepted treatment for the prevention of Black Shank for his 2009 tobacco crop, and that Black Shank did not cause losses to its 2009 Crop [FOF 11, 13, 23]. Appellant argues that it used the proper and accepted treatment to prevent Black Shank. Appellant further argues Black Shank did not cause insurable losses to its 2009 Crop. Agency cites to the NCSU 2009 Flue-Cured Tobacco Guide (Guide) in support of its claim that Appellant failed to apply the correct preventive chemical for Black Shank for two varieties of tobacco that it planted in 2009. According to RMA, the Guide states that because Appellant planted tobacco varieties that were less resistant to Black Shank, Ridomil Gold or Ultraflourish are the most effective chemical treatments to control Black Shank. RMA asserts that because Appellant did not use Ridomil Gold or Ultraflourish, losses resulting from Black Shank are uninsurable causes of loss.

The NCSU Plant Pathologist (one of the authors of the Guide who wrote the chapter on tobacco diseases) and the Extension Agent testified that although it is true that the Guide recommends producers use Ridomil Gold or Ultraflourish to prevent the outbreak of Black Shank, Appellant used the most commonly accepted prevention methods for the prevention of this disease for County [FOF 24]. The NCSU Plant Pathologist also testified that she could find no evidence that Black Shank was present in Appellant's 2009 Crop [FOF 13, 24]. I find RMA offered no credible evidence to refute the NCSU Plant Pathologist and Extension Agent's testimony or the supporting documentation regarding this issue.

I conclude the evidence establishes that Appellant used the normally accepted treatment for the prevention of Black Shank for his 2009 tobacco crop and that Black Shank did not cause insurable losses to its 2009 tobacco crop.

**Did Appellant show Agency erred in its decision because it had insurable losses to its 2009 tobacco crop due to naturally occurring disease? No.**

The evidence does not establish that Appellant's 2009 tobacco crop losses resulted from naturally occurring disease [FOF 11, 13, 23, 24]. Appellant did not report any losses due to disease until the harvest of its crop was within a month of completion [FOF 5, 11]. Manager argues that is when he realized Appellant would have production and quality losses. In reviewing Appellant's claim for losses, representatives from RMA and RCIS observed an extensive amount of un-harvested, dead leaves remained on the tobacco stalks in numerous fields [FOF 7, 9]. Because of these observations, RCIS advised Appellant to obtain the assistance of a specialist who could confirm the cause of loss [FOF 8]. Manager contacted Extension Agent. Extension Agent informed him that he would not be available for 3 weeks and he could contact the Extension Agent for Other County. Manager chose to wait for his return [FOF 8]. Extension Agent reviewed Appellant's fields on October 10, 2009. Despite the fact that his visit occurred

10

JOC Farms, LLC
Case No. 2011S000349

after Appellant had completed the harvest of its 2009 Crop, the Extension Agent concluded Appellant's crop losses resulted from disease. The samples he sent to the NCSU Plant Disease Clinic yielded almost no disease information [FOF 11]. The presence of disease in one or two samples does not support a conclusion that Appellant's crop losses resulted from disease [FOF 11, 13]. Extension Agent testified no other tobacco growers reported extensive disease outbreaks in County in 2009 [FOF 23].

I find the overwhelming amount of evidence presented in this appeal contradicts the Extension Agent's conclusion that Appellant's losses resulted from naturally occurring disease [FOF 4, 7, 8, 9, 11-13, 23, 24]. Both the Extension Agent and the NCSU Plant Pathologist testified that the tobacco plants shown in the RMA photographs appeared to have died or burned up in the field from old age [FOF 24]. The evidence strongly supports Appellant's losses resulted from his failure to timely harvest his 2009 Crops and not from disease [FOF 4, 7, 8, 9, 11-13, 23, 24].

I conclude Appellant did not establish it had insurable losses due to naturally occurring disease.

**Did Appellant show Agency erred in its decision when it included the appraised un-harvested tobacco in the production to count? No.**

Because Appellant did not show his losses resulted from an insurable cause of loss, RMA correctly included the appraised un-harvested tobacco in the production to count. Section 15(a) of the Basic Provisions states calculations of an indemnity and any payment reductions will include all production determined in accordance with the policy. Section 15(b) of the Basic Provisions states production includes appraised production for acreage the producer does not intend to harvest. Section 12(c) of the Crop Provisions states that the total production to count for all insurable acreage on the unit will include all appraised production lost due to uninsured causes and all harvested production from insurable acreage.

Appellant offered no evidence on this issue. Instead, it simply argued that all of its losses were insurable and therefore including the appraised un-harvested tobacco in the calculation of its 2009 tobacco production was in error. I have already concluded above that the evidence establishes Appellant failed to timely harvest portions of its 2009 tobacco crop.

Therefore, I conclude RMA correctly instructed RCIS to include the appraised un-harvested tobacco in the production count.

**Did Appellant show Agency erred in its decision because it accepted RCIS's recalculation of the number of insured acres? No.**

Although both parties used uncorrected GPS data to determine the number of acres for each of the FSNs, the LAM at Section 3 requires use of RCIS's measurements to determine the amount of acres for the loss claim. Sections 6(d)-(i) of the Basic Provisions requires adjustment to reported acres when discrepancies in reporting are found.

In this instance, because neither FSA nor a Measurement Service measured Appellant's acreage, its acres are considered in the LAM at Section 3-E as "acres not measured." For acres not

11

JOC Farms, LLC
Case No. 2011S000349

measured, the LAM at Section 3-E provides that the acres reported on Appellant's Crop Insurance Acreage Report be considered "determined acres" for claim purposes if (1) the insured has signed the acreage report indicating certification of the reported information and (2) the adjuster can determine through visual inspection of the acreage and with the use of FSA certified acreage reports or aerial photo copies, (obtained from the local FSA office or other acceptable sources), landmarks, etc., that the acreage would measure within five percent of the acreage reported on the acreage report. However, the LAM at Section 3-E directs that if an adjuster measures the acres because the adjuster does not believe the reported acres would be within the five percent tolerance, the AIP must use the measured acres even when the measured acres are within the five percent tolerance. The LAM at Section 3-F further directs that the AIP must measure the acreage if the AIP questions the accuracy of the reported acres. In compliance with the LAM at Sections 3-E and 3-F, the RCIS adjuster completed the acreage measurements and concluded Appellant over-reported 16.61 acres [FOF 10].

I conclude RMA correctly concluded the LAM requires use of RCIS's measured acres over Appellant's measurements. Therefore, I conclude Appellant failed to show error in RMA's decision that RCIS must adjust the acreage used for Appellant's insurance claim.

**Did Appellant show the indemnity payment it received from RCIS was in error?**

After extensive reflection on this question, and a review of the regulations and evidence, I conclude this question is not an issue that is within the scope of NAD's jurisdiction. As RMA indicated during the hearing, the calculation and disbursement of indemnity payments to a policyholder is not within RMA's authority [FOF 19]. Even in an instance where RMA may participate in the review of a large claim, RCIS makes all calculations and conclusions regarding payments to its policyholders [FOF 19]. See also Manager's Bulletins MGR-05-009 and MGR-05-009.1. There is some evidence that RMA intended to review the final calculations for the indemnity payment; however, there is no evidence in the record showing RMA participated in or assisted with the calculation of the payment made to Appellant [FOF 19].

Because RMA does not have authority over this issue, NAD is also without jurisdiction to address it in this appeal.

## DETERMINATION

Seven C.F.R. § 11.8(e) provides that an appellant bears the burden of proving that an agency's adverse decision is erroneous by a preponderance of the evidence. In this case, Appellant did not meet this burden. Although I conclude the Agency's decision contains error, it is not material error because it does not change the outcome of the underlying Agency decision.

This is a final determination of the Department of Agriculture unless a party files a timely request for review.

JOC Farms, LLC
Case No. 2011S000349

Dated and mailed this 11th day of July 2011.

*Glenna J. Sheveland*

Glenna J. Sheveland
Hearing Officer
National Appeals Division

Attachments:
Notice of Right to Request Director Review and/or Copy of Audio Recording
Request for Director Review


Distribution of copies:

Appellant:
JOC Farms, LLC
Joseph Briley, Jr., Manager
4747 US Highway 264E
Greenville, NC 27835

Appellant's Representatives:
Hugh Stevens
Michael J. Tadych
Stevens Martin Vaughn & Tadych, PLLC
The Historic Pilot Mill
1101 Haynes Street, Suite 100
Raleigh, NC 27604-1455

Interested Parties:
Rural Community Insurance Services
Tonya Rowe, Compliance/Operational Risk Manager
3501 Thurston Avenue
Anoka, MN 55303-1060

Rural Community Insurance Services
Charlie Fox, RCIS Area Claims Manager
4035 University Parkway, Suite 301
Winston-Salem, NC 27106

AgCarolina
Attn: Greg Gladson
100 East First Street
Greenville, North Carolina 27835

JOC Farms, LLC
Case No. 2011S000349

Agency Decision Maker/Representatives:
Larry N. Atkinson, Director
USDA, Risk Management Agency
4405 Bland, Suite 160
Raleigh, NC 27609

Sent via UPS:
RMA Appeals Coordinator
Bernice Rhodes, Paralegal Specialist
USDA/RMA/Appeals, Litigation and Legal Liaison Staff
Stop 0806
1400 Independence Avenue, S.W.
Washington, D.C. 20250-0806

JOC Farms, LLC
Case No. 2011S000349

## NOTICE OF RIGHT TO REQUEST DIRECTOR REVIEW
## AND/OR COPY OF AUDIO RECORD

**DIRECTOR REVIEW REQUEST**

Either party may request that the Director of the National Appeals Division (NAD) review this determination. A suggested format is attached, but any request is acceptable *if it has all the information in the "Instructions for Request for Review" listed below.*

**An appellant or third party** who believes that this determination is wrong must file a request for Director review within **30 days** of receipt of this determination. Unless appropriate documentation shows otherwise, the Director presumes that it usually takes 7 days for a determination to reach an appellant by mail. However, the Director will accept requests filed more than 37 days from the date of the determination if the person shows that receipt of the determination took longer than usual. A request must be in writing and be signed by the appellant or third party. A request must also follow the "Instructions for Request for Review" listed below.

**The agency** may also file a request for Director review if it believes this determination is wrong. The agency must file its request within **15 business days** of receipt of this determination. The head of the agency or someone acting in that capacity must sign the request. The agency must also follow the "Instructions for Request for Review" listed below.

Parties may file written responses to a request for Director review within **5 business days** of receipt of a copy of the request for review.

The date a document is considered "filed" is either the date it is delivered in writing to NAD, its postmark date, or the date that a complete facsimile copy is received by NAD.

15

Case 4:12-cv-00186-D   Document 1-1   Filed 08/09/12   Page 15 of 17

JOC Farms, LLC
Case No. 2011S000349

## Instructions for Requests for Review

A request for review must include the following information:

- be personally signed and dated by appellant, third party or head of the agency;
- specifically request a review;
- give the case number for the Hearing Officer determination (the case number is on the top right-hand side of the first page of the determination);
- note the date the requester received the Hearing Officer determination;
- say why the determination is wrong;
- confirm that the requester has also sent a copy of the request and additional information, if any, to the other party at the same time that the request was sent to NAD; and
- be mailed, faxed or delivered by commercial delivery service to:

Mailing Address:

    National Appeals Division
    Regional Office
    P.O. Box 1508
    Cordova, TN 38088

Physical Address:

    National Appeals Division
    57 Germantown Court, Suite 203
    Cordova, TN 38018

| | |
|---|---|
| Fax Number: | 1-901-544-0363 |
| Phone Number: | 1-800-552-5377 |
| TDD Number: | 1-800-627-8332 |

NAD Website: www.nad.usda.gov

**COPY OF AUDIO RECORD REQUEST**

The appellant(s), third parties, and the agency may obtain a copy of the audio record made of the pre-hearing/hearing proceedings at no cost. Copies may be obtained by making a written request to the NAD Regional Office.

JOC Farms, LLC
Case No. 2011S000349

## REQUEST FOR DIRECTOR REVIEW

I/We, *(print* name(s)) _____, am/are the Appellant(s)/Third Party/Agency head in the above-referenced appeal and I/we request a Director review of the appeal determination in this case.

The case number is: _____.

I/We received the appeal determination on _____.

The specific reasons why I/we believe the appeal determination is wrong are: (The requester may attach additional sheets and documents, if desired.)




A copy of this request, along with any attachments, was mailed to the other parties on _____.

I swear that all statements in this filing are true to the best of my knowledge and belief.


_____          _____
**Appellant(s)/Third Party/Agency head signature(s)**          **Date**