## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
## No. 4:12-CV-186-D

| | |
|---|---|
| J.O.C. FARMS, LLC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| RURAL COMMUNITY INSURANCE | ) |
| AGENCY, INC., d/b/a RURAL | ) |
| COMMUNITY INSURANCE SERVICES; | ) |
| FIREMAN'S FUND INSURANCE COMPANY; | ) |
| WILLIAM J. MURPHY, Administrator; | ) |
| THOMAS JAMES VILSACK, Secretary; and | ) |
| THE UNITED STATES OF AMERICA | ) |
| DEPARTMENT OF AGRICULTURE, Risk | ) |
| Management Agency; | ) |
| | ) |
| Defendants. | ) |

This case involves a dispute between J.O.C. Farms, LLC ("JOC Farms" or "JOC") and its insurer, Rural Community Insurance Agency, Inc. ("RCIS"), regarding proceeds under two federally reinsured crop insurance policies. On October 31, 2014, the court held a hearing and granted RCIS and the Fireman's Fund Insurance Company's motion to dismiss and granted in part and denied in part the motion to dismiss of William J. Murphy,[1] Thomas James Vilsack, and the United States Department of Agriculture's Risk Management Agency ("RMA"). See [D.E. 66, 67]. The only remaining claim is for judicial review under the Administrative Procedure Act ("APA").

_____

[1] The court automatically substitutes Brandon Willis, the current Manager and Chief Executive Officer for the Federal Crop Insurance Corporation and the Administrator of the Risk Management Agency for the United States Department of Agriculture, for former Administrator William J. Murphy. See Fed. R. Civ. P. 25(d).

On December 30, 2014, William J. Murphy, Thomas James Vilsack, and RMA (collectively, "federal defendants") moved for summary judgment on the remaining APA claim [D.E. 68] and filed a supporting memorandum [D.E. 69]. On February 6, 2015, JOC Farms responded in opposition to the federal defendants' motion for summary judgment [D.E. 72]. On February 9, 2015, JOC Farms filed an amended response in opposition to the motion for summary judgment [D.E. 73].[2] On March 2, 2015, the federal defendants replied [D.E. 77]. As explained below, the court denies the federal defendants' motion for summary judgment and remands the case to the Department of Agriculture.

I.

In 2009, JOC Farms purchased two Multi-Peril Crop Insurance Polices. Compl. [D.E. 2] ¶¶ 13, 17. "The Policies were underwritten by Fireman's Fund, reinsured by the USDA through the FCIC, issued by RCIS in its capacity as Fireman Fund's managing general agent, and placed through RCIS's agent Dwain Woolard d/b/a Wollard Insurance Agency, Inc." Id. ¶ 13. One policy insured JOC's farm in Pitt County, North Carolina, and the other insured JOC's farm in Beaufort County, North Carolina. See id. ¶ 19. The respective policies provided a tobacco crop yield guaranty to JOC, protecting against loss in case of unfruitful harvest returns. See id. ¶ 18. Under the policies, JOC's Pitt County farm was guaranteed a minimum yield of 345,277 pounds at $1.85 per pound and JOC's Beaufort County farm was guaranteed a minimum yield of 976,696 pounds at $1.85 per pound. Defs.' Reply [D.E. 77] 13 n.11; AR 1025; cf. JOC's Resp. [D.E. 73] 19 (claiming the Beaufort farm was guaranteed 974,325 pounds); AR 601.[3]

---

[2] To the extent JOC moves to open the administrative record [D.E. 73], the motion is denied. In conducting its APA review, the court did not consider the documents attached to JOC's response that were not presented to the agency below.

[3] The Administrative Record is filed in fourteen docket entries in a separate case file at docket number 4:13-MC-1-D (E.D.N.C.). All future citations to the administrative record will be to "AR" and the corresponding Bates number.

2

JOC Farms's 2009 tobacco harvest "failed to meet . . . expectations of yield and quality." AR 364; see Compl. ¶ 20, 28. For the 2009 season, JOC's total revenue from tobacco sales was $183,349 from the Pitt County farm and $795,533 from the Beaufort County farm. Compl. ¶ 28; AR 835–89; cf. AR 388 (noting that JOC sold 765,694 pounds of tobacco from the Beaufort County farm). On September 1, 2009, JOC reported its losses to RCIS and attributed them to plant disease. AR 170, 225, 369. On September 2, 2009, RCIS initiated an investigation of JOC's claims. AR 171. RCIS eventually paid JOC Farms $389,448 for its Pitt County losses. Compl. ¶ 53; cf. [D.E. 53-2] 1.[4]

On September 3, 2009, RMA elected to participate in the loss determination for the Beaufort County claim. AR 171, 369. RCIS's and RMA's investigations lasted several months and included, among other things, field visits, stalk counts, and plant analysis and testing. See AR 171–72, 225–26, 372–81, 420.

On October 15, 2009, Gaylon Ambrose ("Ambrose"), an extension agent for the North Carolina Cooperative Extension Service, sent JOC Farms a letter detailing "observations as to the most likely causes that had a negative impact" on JOC's 2009 tobacco crops. AR 364–65. Ambrose identified tomato spotted wilt virus, black shank, brown spot, and tobacco mosaic virus as the primary "causes of crop yield and quality losses," but also noted that these diseases "were intensified

_____

[4] Because RMA did not formally participate in the Pitt County claim, JOC was contractually obligated to pursue alternative dispute resolution to dispute any award concerning the Pitt County losses. JOC did not pursue arbitration and instead filed suit in this court in August 2012. On February 8, 2013, Judge Flanagan granted a motion to compel arbitration of the Pitt County claim [D.E. 32]. On December 9, 2013, the arbitrator dismissed the Pitt County claim as time barred [D.E. 53-2]. On October 31, 2014, this court dismissed JOC's breach of contract claims concerning the Pitt County losses for failure to state a claim. See [D.E. 67]. Because the federal defendants only reviewed the Beaufort County claim, only the Beaufort County claim is subject to APA review. Thus, the remainder of the order refers only to the Beaufort County claim and any future reference to "losses" refers only to the Beaufort County losses.

3

by adverse weather conditions." AR 364-65. On November 10, 2009, RCIS changed the cause of loss, and claimed that only 60% of the losses were due to plant disease while the other 40% were caused by excess precipitation. See AR 172, 393, 584-86.

On April 15, 2010, RMA's Raleigh Regional Office ("RRO") issued its final decision and concluded that no indemnity payment was due because JOC's "lack of timely harvest and failure to purchase and apply the proper fungicides . . . contributed to the uninsured cause of loss." AR 371, 386-89. The RRO found that because JOC sold 765,694 pounds of tobacco and because an additional 256,248 pounds of tobacco was considered "production lost due to uninsured causes" and was therefore calculated into total production to count, the total production to count "exceed[ed] the total guarantee (sold production of 765,694 lbs plus production lost to uninsured causes of 256,248 lbs = 1,021,942 total production to count. This is more than the total guarantee of 974,325 lbs)." AR 387-88.[5] Thus, the RRO concluded that "no indemnity for the 2009 crop year" was warranted. AR 388.

In its decision, the RRO relied on Ambrose's observations and listed JOC's plant diseases as "Tomato Spotted Wilt, Brown Spot, Target Spot, Tobacco Mosaic Virus and Black Shank." AR 370, 384-85.[6] The RRO found that JOC "did not purchase the proper or necessary fungicides to control or eliminate plant disease." AR 385. In particular, the RRO noted that Azoxystrobin is "the recommended product for target spot" and that black shank "should be treated with Mefenoxam." AR 385. Thus, the RRO concluded that the diseased crops were not covered because the policy

---

[5] The RRO incorrectly calculated this total guarantee. See AR 175; Defs' Reply 13 n.11.

[6] Ambrose's letter did not identify "target spot" as a cause of JOC's losses. Rather, Ambrose's letter referenced target spot only in an exemplary fashion. See AR 364 ("As is the case with other leaf-spot diseases, such as target spot, brown spot often increases in severity as the season progresses. Typically, brown spot and target spot begin by affecting lower leaves first . . . .").

4

excluded coverage for "damage due to insufficient or improper application of disease control measures." See AR 384; see also AR 780 (section 10(d) of the Guaranteed Tobacco Crop Provisions).

As for JOC's excess-precipitation claim, RCIS and RMA "research[ed] and gather[ed] the precipitation data for Beaufort County and JOC Farms, LLC during the months of June, July, August, and September 2009" and found that the "average rainfall received on [JOC's] tobacco farms was actually less than the average for Beaufort County." AR 370–71. Moreover, the 2009 rainfall in Beaufort County for this four-month period was 10.12 inches less than the 30-year historical rainfall average. See AR 371. The RRO also found that JOC "did not have the barn capacity to cure 198.55 acres of [its] tobacco," and "the insufficient barn space led to a lack of timely harvest resulting in the deterioration of un-harvested tobacco in the field." AR 386.

In May 2010, JOC Farms requested mediation and an administrative review of the April 15, 2010 decision. AR 392, 421. On May 26, 2010, the director of the Risk Management Services Division notified JOC that the administrative review would "be held in abeyance until Mediation has concluded." AR 392, 421. On May 28 and June 17, 2010, mediation sessions were held, but the parties did not resolve the dispute. AR 421, 481.

On June 30, 2010, the RRO issued a revised final decision ("revised decision"). AR 393–419, 421. In its revised decision, the RRO again concluded that "the lack of timely harvest and failure to purchase and apply the proper fungicides and other appropriate chemicals . . . contributed to the uninsured cause of loss." AR 398; see AR 394–98. The RRO's revised decision again relied on Ambrose's observations, but removed target spot as a potential cause. See AR 394 (listing JOC's plant diseases as "Tomato Spotted Wilt Virus, Black Shank, Brown Spot, and Tobacco Mosaic Virus").

5

The RRO's revised decision detailed each of the claimed plant diseases, the appropriate treatment methods for each, and JOC's farming practices. AR 394–98. As for tomato spotted wilt virus, the RRO found that JOC "applied the appropriate rate of Admire Pro," the insecticide that the North Carolina State University 2009 Flue-Cured Tobacco Guide ("NCSU Guide") recommended, but that JOC "did not follow the recommendation of applying Admire Pro in the greenhouse to the seedlings, [and] instead . . . applied it in the fields prior to transplanting [the] tobacco," which "indicates a less effective method of treatment was used." AR 395; see AR 361 (letter from JOC Farms to RMA detailing its farming practices). Moreover, the RRO found no evidence that Actigard, a recommended fungicide, "was purchased for [JOC's] 2009 tobacco crop." AR 395. Regarding black shank, the RRO noted that JOC's fumigant choice, Telone C-17, is a recommended product, but also claimed that Telone C-17 "does not provide complete control but is recommended for use by making a soil application prior to transplanting followed by an application at first cultivation and another application at lay-by." AR 397; see AR 360. Accordingly, the RRO found the JOC did not follow the recommended procedures for applying and using Telone C-17. AR 397–98. The RRO also found no evidence that Ridomil Gold or Ultraflourish, the "most effective" systematic fungicides, "were purchased for [JOC's] 2009 tobacco crop." AR 397. As for brown spot, the RRO determined that JOC "follow[ed] the [NCSU Guide] recommendations for the appropriate amounts of sucker control," but that JOC's application rate of Telone C-17 was ".2 gal/acre less than" recommended. AR 397–98; see also AR 360. Furthermore, the RRO found "visible evidence that [JOC] did not timely harvest, therefore, intensifying the Brown Spot in [its] tobacco fields." AR 398. Lastly, concerning tobacco mosaic virus, the RRO noted that "[s]trict sanitation procedures are necessary to prevent the virus from becoming established," and found that while JOC claimed that it "regularly cleaned [its] tobacco greenhouses and equipment . . . with a 6

6

percent Clorox solution . . . the [NCSU Guide] recommends disinfecting equipment with 25 to 50 percent household bleach." AR 398.

As for the excessive-precipitation claim, the RRO noted in the revised decision that it "could not substantiate that the 2009 harvest season was excessively wet as claimed, to the extent that it would prevent timely harvest of the tobacco crop." AR 398–400. Moreover, the RRO found that "the tobacco crop was burning up in the fields due to the lack of timely harvesting because there was not sufficient barns to house the harvested tobacco." AR 414; cf. AR 424–25.

The RRO's revised decision reduced the "production lost due to uninsured causes" amount to 197,805 pounds. AR 415–16. The revised decision also reduced JOC's total guarantee to 945,630. Id. Thus, the RRO again concluded that no indemnity was warranted for the 2009 crop year because the total production to count (963,499) exceeded the total guarantee (945,630). AR 415–17.

On July 30, 2010, JOC requested administrative review of the RRO's revised decision and responded to numerous issues raised in the RRO's revised decision. AR 420–25. In its response, JOC claimed that Admire Pro "was applied in the greenhouse, as the Guide recommends," noted that NCSU Guide acknowledges that greenhouse treatment of Actigard in combination with Admire "may result in early-season leaf damage and stunting," and argued that using "Actigard in combination with Admire is not a standard practice among tobacco farmers in the Beaufort County area." AR 422–23 (quotation omitted). In response to the RRO's comments regarding JOC's improper application of Telone C-17, JOC claimed that its methods were "completely consistent with standard and customary practice in the Beaufort County area," and argued that the NCSU Guide "makes it clear that such additional applications are not a hard and fast rule." AR 423. As for JOC's decision not to purchase Ridomil Gold or Ultraflourish, JOC claimed that it was "not aware of

7

anything in the applicable law or regulations that authorizes RMA to deny a claim on the grounds that a farmer relied on a recommended and widely-used fungicide but did not use the specific product deemed 'most effective.'" AR 423. JOC did not substantively respond to the RRO's revised decision regarding brown spot, claiming only that the RRO was "finding fault even where none exists." AR 423. As for the RRO's determination that JOC did not use a potent enough bleach to ward off tobacco mosaic virus, JOC claimed that Clorox solution was used to wash transplant trays and that "use of any stronger bleach solution for this purpose may leave a residue that is damaging to the seedlings" and that it used a stronger solution to "sanitize equipment that has come into direct contact with foliage." AR 424.

As for the RRO's findings regarding precipitation, JOC claimed that the RRO's measurements were inconsistent and failed to grasp that "when it comes to rainfall, the issue is not simply 'how much' but 'when.'" AR 425. "Occasional heavy downpours," JOC argued, "will leave agriculrural fields saturated and unworkable longer than the same amount of rainfall generated by a series of more modest showers." Id. Lastly, regarding barn capacity, JOC claimed that RMA "relinquished this assertion after mediation," and noted that JOC's position "is that any inability on its part to harvest its 2009 tobacco crop in a timely manner was attributable to the diseases discussed . . . and to excessive and untimely moisture that prevented it from gaining access to wet fields." AR 424.

In sum, JOC's response argued that the RRO failed to show that JOC's "practices and procedures differed in any material or significant way from those recommended by the [NCSU Guide] or from those employed by other tobacco farmers in Beaufort and nearby counties," AR 424, and claimed that the RRO's revised decision was "arbitrary, capricious and discriminatory because it is inconsistent with the treatment accorded 2009 federal crop insurance claims submitted by [other]

8

tobacco farmers in Beaufort and Pitt Counties and whose losses were similar in kind and scope."
AR 425.

On February 9, 2011, RMA issued its administrative review decision ("ARD"). AR
481–506. In the ARD, RMA agreed with JOC that using Admire Pro alone to guard against tomato
spotted wilt virus "was sufficient according to the recommendations for flue cured tobacco in
Beaufort, North Carolina." AR 490. RMA upheld in part the RRO's decision regarding black shank
because it found that two of the three varieties of tobacco that JOC planted were "less resistant to"
blank shank and therefore treatment with "Ridomil Gold or Ultra Flourish combined or not with
Telone C-17" was recommended. AR 490–93. RMA also disagreed with the RRO's findings
regarding tomato mosaic virus. RMA found that JOC's sanitation measures were "in line with
recommendations from the [NCSU Guide]," and, therefore, RMA did not uphold the RRO's decision
on that issue. AR 494–96. As for excess precipitation, RMA found that "there was rainfall during
the harvest season," but found that there were also "a number of consecutive days with no
precipitation that would have allowed continued harvest." AR 498. RMA also rejected the RRO's
decision that JOC had insufficient barn capacity. Id. Although RMA was unable to determine to
what extent JOC was responsible, it found that JOC's decision to "delay harvest and not remove
lower leaves" impacted the prevalence of brown spot on its crop and "negatively affected . . . tobacco
production." AR 494. RMA also found, however, that "some late season precipitation . . .
contributed to the [brown spot] losses." Id. Therefore, RMA agreed with JOC that "an insurable
cause of loss did exist." Id.

In sum, the RMA's administrative review decision held that JOC did not sufficiently control
against black shank, improperly delayed harvesting, and was responsible for the unharvested
tobacco. AR 498–500. However, the RMA's administrative review decision also noted that "an

9

insurable cause of loss existed and that disease and excess precipitation affected [JOC's] 2009 flue cured tobacco crop." AR 499. Thus, RMA found that there were both insured and uninsured causes of losses and remanded the case to RCIS and RRO to calculate a final indemnity amount. See AR 498–500. In doing so, RMA noted that "the unharvested tobacco . . . will be included in your total production to count," but that a quality adjustment factor "will apply to the harvested tobacco" because an insurable cause of loss was determined. AR 498–500.

On February 25, 2011, RCIS sent JOC Farms a letter stating that it had completed the "2009 Beaufort County Tobacco Claim based on RMA's Administrative Review Decision." AR 507. RCIS noted that the administrative review decision found that JOC did not "use proper chemicals to control Black Shank on farms planted to varieties CC27 and K326." AR 507. Thus, RCIS determined that a quality adjustment was appropriate only for the fields planted to CC35 because only those fields were properly treated for black shank. See AR 507; see also AR 174.[7] RCIS determined that a quality adjustment factor of .9460 was warranted. AR 507; see AR 1025.[8] Applying that quality adjustment factor, RCIS determined that JOC was entitled to $76,492 for "production with quality adjustment." AR 1025. RCIS calculated that amount by applying the quality adjustment factor (.9460) to JOC's entire harvested production (765,694 pounds). Thus, RCIS held JOC accountable for 724,347 pounds of harvested tobacco. Accordingly, RCIS calculated

---

[7] In making its indemnity calculation, RCIS apparently ignored RMA's finding that "late season precipitation" contributed to the prevalence of brown spot and represented "an insurable cause of loss." AR 494.

[8] RCIS calculated the quality adjustment factor by totaling the monies received from farms planted to CC35 ($162,027.11) and (what should have been the market price) of the production from farms planted to CC27 and K326 (638,172 pounds at $1.85 price election = $1,180,618.20), which cumulatively equaled $1,342.645.31. RCIS then divided that amount ($1,342,645.31) by the total harvested production from all farms (765,694), and yielded $1.75 as an average value. Lastly, RCIS divided $1.75 as an average value by the market price of $1.85, "resulting in the quality adjustment factor of .9460." AR 507.

10

the quality loss indemnity amount to be:

| | |
|---|---|
| Total Lb. Guarantee: | 976,696 |
| - Quality Adjusted Production Sold: | 724,347 |
| - Uninsured Production Lost: | 197,805 |
| - Production Loss | 13,197 |
| | |
| Total Quality Loss: | =41,347 |
| x Price Election | 1.85 |
| | |
| **Quality Loss Indemnity** | **= $76,492** |

AR 1025.

RCIS also determined that JOC was entitled to $24,415 for "production [without] quality

adjustment." AR 1025. RCIS calculated the production loss indemnity to be:

| | |
|---|---|
| Total Lb. Guarantee: | 976,696 |
| - Production Sold: | 765,694 |
| - Uninsured Production Lost: | 197,805 |
| | |
| Production Loss | =13,197 |
| x Price Election | 1.85 |
| | |
| **Production Loss Indemnity** | **= $24,415** |

AR 1025. Thus, RCIS determined that a total indemnity payment of $100,907 was due. AR 1025.

On March 3, 2011, RCIS paid JOC an additional $2,889.32 for interest owing on the

$100,907 indemnity amount. AR 795-98.

On March 10, 2011, JOC appealed the February 9, 2011 decision to the United States

Department of Agriculture's National Appeals Division ("NAD") and requested a hearing. AR 31.[9]

---

[9] The term "appeal" is used loosely. Technically, RMA's February 9, 2011 decision was an "informal review" of an adverse decision issued by "the field service office level." See 7 C.F.R. § 11.5(a),(b). Thus, the "appeal" to the NAD is not an "appeal" in the traditional sense because the NAD hearing officer had the power to consider completely new evidence and was not bound by the factual findings in the RRO's revised decision. See 7 C.F.R. § 11.8(c)(5)(ii) ("The Hearing Officer will allow the presentation of evidence at the hearing by any party without regard to whether the evidence was known to the officer, employee, or committee of the agency making the adverse decision at the time the adverse decision was made."); 7 C.F.R. 11.10(a) ("In making a

Case 4:12-cv-00186-D   Document 80   Filed 09/17/15   Page 11 of 22

Although JOC recognized that RMA's decision "was favorable to [JOC], and adverse to the [RRO] with respect to numerous issues," JOC argued that RMA "incorrectly and unjustifiably" determined: (1) that JOC's crop was infected with black shank; (2) that JOC did not apply sufficient disease control measures for black shank; and (3) that JOC did not apply sufficient fungicide to prevent black shank. AR 31. JOC also argued that RMA "incorrectly and unjustifiably" approved the RCIS's indemnity calculations. AR 31. JOC claimed that RCIS's indemnity calculations improperly omitted the quality adjustment factor, applied incorrect acreages, and did not include the proper amount of interest. AR 31–32.

On April 14, May 5, and May 24, 2011, an NAD hearing officer held a hearing. On July 11, 2011, the hearing officer issued the appeal determination. See AR 168–184. The appeal determination contains six essential findings: (1) JOC's losses "resulted from a failure to timely harvest its tobacco crop" and not from excessive rain; (2) JOC used "the normally accepted treatment for the prevention of Black Shank for [its] 2009 tobacco crop and . . . Black Shank did not cause insurable losses to [JOC's] 2009 tobacco crop"; (3) JOC "did not establish it had insurable losses due to naturally occurring disease," rather "the overwhelming amount of evidence" shows that the losses resulted from untimely harvesting; (4) the appraised unharvested tobacco was correctly included in the production count; (5) use of RCIS's acreage measurements over JOC's acreage measurements in determining the amount of acres for the loss claim was appropriate; and, (6) review of the "calculation and disbursement of indemnity payments" was outside RMA's jurisdiction because RCIS "makes all calculations and conclusions regarding payments to its policyholders." AR

---

determination, the Hearing Officers . . . are not bound by previous findings of fact on which the agency's adverse decision was based."). Nevertheless, on "appeal," JOC had the burden to prove "that the adverse decision of the agency was erroneous by a preponderance of the evidence." 7 C.F.R. § 11.8(e).

12

175–79.[10] Thus, the hearing officer concluded that "RMA's decision contains error," but found that "the error is not material" because it "does not change the outcome of the underlying Agency decision." AR 168–69, 179.

On August 12, 2011, JOC Farms requested director review of the July 11, 2011 NAD decision. AR 187. JOC argued that the hearing officer erred in: (1) concluding that JOC "did not have insurable losses to its 2009 tobacco crop . . . owing to naturally occurring disease"; (2) determining that JOC's "2009 losses . . . were attributable to JOC Farms' failure to timely harvest the crop"; (3) determining that "none of the losses . . . were attributable to excessive rainfall"; and, (4) determining that "the Loss Adjustment Manual ("LAM") required RCIS to adjust JOC Farms' certified acreage." AR 188–200.

On May 8, 2012, James T. Murray, the Deputy Director of NAD, issued his Director Review Determination. AR 224–31; see 7 C.F.R. § 11.9(d)(3). The Deputy Director concluded that the July 11, 2011 decision was "supported by substantial evidence in the record" and was "consistent with applicable laws and regulations." AR 225. On May 15, 2012, the Director of NAD, sent a letter to Congressman Walter B. Jones, who had inquired about the status of the appeal on behalf of JOC Farms. AR 221. In the letter, the Director noted that "[t]he administrative processing of [JOC]'s appeal is now complete. Judicial review of [NAD's] decision may be had in a United States District Court of competent jurisdiction." AR 221.

On August 9, 2012, JOC Farms filed suit in this court. JOC seeks judicial review pursuant

_____

[10] The hearing officer noted that to the extent RMA intended to "review the final calculations for the indemnity payment," RMA erred. AR 179; see AR 500 (February 9, 2011 decision by RMA stating that "[t]he final indemnity calculations and worksheets will be reviewed by our office prior to any payments being issued."). The hearing officer also noted, however, that "there is no evidence in the record showing RMA participated in or assisted with the calculation of the payment made to Appellant." AR 179.

13

to the APA, and asks the court to "compel agency action unlawfully withheld or unreasonably delayed," "declare unlawful and vacate all agency actions" found to be in violation of the APA, and order "such relief as is just and proper." Compl. ¶¶ 46–49.

## II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587.

The Rule 56(a) standard applies differently for an APA claim. "A court conducting judicial review under the APA does not resolve factual questions, but instead determines whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision

14

it did." Ohio Valley Envtl. Coal. v. Hurst, 604 F. Supp. 2d 860, 879 (S.D. W. Va. 2009) (quotation omitted); see Defenders of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392–93 (4th Cir. 2014); Occidental Eng'g Co. v. INS., 753 F.2d 766, 769–70 (9th Cir. 1985). Thus, in an APA claim, "summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Hurst, 604 F. Supp. 2d at 879 (quotation omitted); see Defenders of Wildlife, 762 F.3d at 392–93; Occidental Eng'g Co., 753 F.2d at 769–70; Kight v. United States, 850 F. Supp. 2d 165, 169 (D.D.C. 2012). Moreover, under the APA, the plaintiff has the burden of proof and must demonstrate that defendants' actions were arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law. Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995).

Under the APA, courts must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . [or] unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). In reviewing agency action, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation omitted); Fort Sumter Tours, Inc. v. Babbitt, 66 F.3d 1324, 1335 (4th Cir. 1995). The "inquiry into the facts is to be searching and careful," but "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Babbitt, 66 F.3d at 1335 (quotation omitted). Courts, however, "must not rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth., 647 F.3d 514, 517 (4th Cir. 2011) (quotation and alteration omitted). "Although the scope of review is narrow, the agency must nevertheless explain

15

the evidence which is available, and must offer a rational connection between the facts found and the choice made." Ohio River Valley Envtl. Coal., Inc. v. Kempthorne, 473 F.3d 94, 102–03 (4th Cir. 2006) (quotation omitted). In its review, the court focuses on the administrative record. Babbitt, 66 F.3d at 1335–36.

The "final" agency action in this case is the Director review determination. See 7 U.S.C. § 6999; 5 U.S.C. § 704; 7 C.F.R. § 11.9(d)(1) ("The Director's determination upon review of a Hearing Officer's decision shall be considered to be the final determination . . . and shall not be appealable."); 7 C.F.R. § 11.13. In conducting the Director review, the Director must consider "the case record, the record from the evidentiary hearing . . . , the request for review, and such other arguments or information as may be accepted by the Director." 7 U.S.C. § 6998(b); see 7 C.F.R. 11.9(d)(1). The Director's determination must "be based on information from the case record, laws applicable to the matter at issue, and applicable regulations." 7 U.S.C. § 6998(c); see 7 C.F.R. § 11.10(b),(c). Like the hearing officer, the Director is "not bound by previous findings of facts on which the agency's adverse decision was based." 7 C.F.R. § 11.10(a). The Director must ensure, however, that the hearing officer's decision "is consistent with the laws and regulations of the agency, and with the generally applicable interpretations of such laws and regulations." 7 C.F.R. § 11.10(b); see 7 U.S.C. § 6998(b) (noting that the director conducts a review "of the determination of the hearing officer"). Moreover, the Director can "uphold[], reverse[], or modif[y] the determination of the hearing officer." 7 U.S.C. § 6998(b).[11]

---

[11] The applicable regulations state that the Director must review the agency record and associated materials, "and such other arguments or other information as may be accepted by the Director, in order to determine whether the decision of the Hearing Officer is supported by substantial evidence." 7 C.F.R. § 11.9(d). The governing statute, however, does not specifically impose a "substantial evidence" standard of review for the Director. See 7 U.S.C. § 6998; Barger v. Johanns, No. 404CV3268, 2006 WL 680889, at *9 (D. Neb. Mar. 13, 2006) (unpublished) (The hearing officer's decision "is not entitled to any deference by the NAD Director, except, perhaps,

"If the record before the agency does not support the agency action, if the agency has not

considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged

agency action on the basis of the record before it, the proper course . . . is to remand to the agency

for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744

(1985). Moreover, "[e]ven if proper reasons do exist from the facts to uphold the decision the court

may not imply them. As in the case where administrative action cannot be upheld on the reasons the

agency has assigned, the court will not state proper reasons and uphold but will remand the case to

the agency." Austin v. Jackson, 353 F.2d 910, 912 (4th Cir. 1965).

After reviewing the administrative record, the court concludes that remand is appropriate.

The court agrees with the federal defendants that JOC waived its argument regarding good farming

practices by failing to raise the argument during the administrative proceedings. See 7 C.F.R. §

11.9(a) (A request for director review "shall include specific reasons why the appellant believes the

_____

with respect to credibility assessments where the hearing officer had the opportunity to observe the
witness testify."). NAD's Hearing Guide states:

> The [Director's] standard of review is whether the adverse decision is consistent with
> the laws and regulations of the agency and supported by substantial evidence in the
> record. While findings of fact will not be disturbed unless contradicted by the record,
> no such deference is given to the analysis, conclusions, and determination of the
> Hearing Office.

United States Department of Agriculture, The National Appeals Division Guide (October 2008), at
56, available at http://www.nad.usda.gov/Forms/NAD%20Guide%20(October%202008).pdf.

The court questions whether, under Chevron, U.S.A., Inc. v. Natural Resources Defense
Council, Inc., 467 U.S. 837 (1984), the agency's imposition of a substantial evidence standard of
review in its regulation is a reasonable construction of the governing statute. See 7 U.S.C. § 6998.
Thus, the court also questions whether the Director improperly applied an overly deferential standard
of review in making his determination. See, e.g., AR 225 (Director's decision stating that he was
"upholding the Hearing Officer's determination as I find on review that it is supported by substantial
evidence in the record"). Nonetheless, because substantial evidence does not support all of the
Director's findings, this court need not resolve the issue.

17

determination is wrong."); cf. Sims v. Apfel, 530 U.S. 103, 108–110 (2000) (noting the lack of an exhaustion requirement in the applicable agency regulations). Nevertheless, substantial evidence does not support the Director's determination that plant disease did not contribute to JOC's crop losses. The Director's determination regarding plant disease fails to "offer a rational connection between the facts found and the choice made." Kempthorne, 473 F.3d at 102–03 (quotation omitted). The Director determined that JOC failed to meet its burden to show the presence of plant disease because he found that there was evidence that JOC's tobacco crop loss was "attributable to senescence; the tobacco crop was not harvested timely." AR 227–28. In so finding, the Director failed to explain how JOC's failure to timely harvest its crops undermines JOC's contention that the tobacco crop suffered from plant disease.[12] The Director seemingly determined that because there was untimely harvesting, then all of JOC's losses were not covered. Plant disease and untimely harvesting, however, are not mutually exclusive causes of loss, and the Director failed to account for how JOC's plant disease contributed, if at all, to any crop loss. Furthermore, the Director's decision does not take into account JOC's stand losses, or those losses resulting from plants that should have been present but were missing due to disease. As JOC noted to the Director in its review request, any untimely harvesting would not apply "whatsoever to the plants that were lost to tomato spotted wilt virus, because those plants were not in existence at harvest time." AR 194.

Here, the only evidence in the record concerning plant disease supported JOC's position that its crop suffered from plant disease, and no evidence confirmed the absence of plant disease. For instance, the Director rejected the findings of the October 26, 2009 plant analysis, which confirmed that JOC's crop suffered from granville wilt, because the Director claimed that "[t]he presence in

---

[12] The record reflects the brown spot is a disease of senescent (old) tissue and that "aging tissue is more susceptible to the brown spot fungus." AR 664. No evidence, however, links untimely harvesting to the other noted diseases.

18

only two samples . . . did not confirm that Appellant's crop loss was due to plant disease." AR 227. In so finding, however, the Director seemingly ignored other evidence in the October 26, 2009 plant analysis results, namely the explicit caveat in the results that they were likely under-reporting the presence of disease. See AR 650–51 ("[T]here could be multiple diseases or diseases in other samples, from which we did not get any disease, but the clinic was not in a position to isolate or identify due to the inadequate samples submitted."). Likewise, the Director (and the hearing officer) failed to explain why they were discrediting the testimony of Gaylon Ambrose and Dr. Asimina Mila.[13] Furthermore, every underlying agency decision implicitly acknowledged that JOC's crops suffered from plant disease. See, e.g., AR 370, 394, 482; see also AR 677 (Agency Position statement noting that the "diseases identified were: tomato spotted wilt virus, black shank, brown spot, and tobacco mosaic virus"). In the ARD, RMA determined that JOC applied the proper disease control measures against tomato spotted wilt virus and tomato mosaic virus. AR 489–96. Thus, the presence of those diseases in JOC's tobacco crop seemingly should have been considered an insurable loss and may have been grounds for an additional quality adjustment.

Before the hearing officer's July 11, 2011 determination, no party disputed the presence of disease. Rather, the parties disputed whether JOC applied proper disease-control measures. Because RMA's decision supported JOC's contention that its crop suffered from plant disease and that JOC

---

[13] The federal defendants argue that the Director "directly addressed the evidence from JOC witnesses Mr. Ambrose and Dr. Asimina Mila" because the Director acknowledged that he was rejecting the findings of the October 26, 2009 tissue analysis. Defs.' Reply 8 n.6. As noted, however, the court questions whether the Director's analysis of the report recognized the caveat that the report was likely under-reporting the presence of disease. In any event, the Director's rejection of a particular analysis does not sufficiently explain why the Director rejected the testimony of Ambrose and Mila on this issue, particularly given that the hearing officer (and, later, the Director when incorporating the hearing officer's findings of fact) relied on Ambrose's and Mila's testimony regarding black shank. The federal defendant's post hoc rationalization does not cure the agency's contemporaneous failure to explain its decision.

properly guarded against the specified diseases, JOC did not appeal that aspect of RMA's decision. See AR 31. Thus, JOC was hindered at the hearing because the hearing officer (and, later, the Director) placed on JOC the burden to prove erroneous an RMA finding that was actually favorable to JOC and which JOC was not appealing. Moreover, JOC may well have presented more or different evidence at the hearing had it known that the existence of plant disease was disputed. Cf. AR 677 (agency position statement for NAD noting that the "diseases identified were: tomato spotted wilt virus, black shank, brown spot, and tobacco mosaic virus"). Because the Director incorporated the hearing officer's findings of fact and relied on the evidence presented at the hearing, the court finds that the agency must give JOC a second opportunity to present evidence on the matter.

Simply put, the only evidence in the record supported JOC's position that its crop suffered from plant disease and substantial evidence does not support the Director's decision to the contrary. On remand, the agency must give JOC the opportunity to present any pertinent additional evidence.

The court also disagrees with the federal defendants' contention that JOC waived any argument regarding an incorrect indemnity payment calculation by RCIS by only raising it before the hearing officer. JOC's request for Director review adequately raised the issue to preclude waiver. See AR 188 (JOC arguing that the hearing officer incorrectly found that RCIS correctly adjusted JOC's certified acreage when calculating the indemnity payment); AR 195–96 (JOC provided the director with its position on how the indemnity payment should have been calculated).

The federal defendants also argue that because the United States Department of Agriculture "did not make the initial payment calculation," there is no "final agency decision" for the court to review regarding the indemnity payment calculation. See Defs.' Reply 10–14. The court disagrees. To the extent the Director chose not to review the hearing officer's determination that "RMA does

20

not have authority over this issue," the Director implicitly upheld that determination and confirmed that the hearing officer's conclusion was consistent with the applicable laws and regulations. See AR 179; 7 U.S.C. § 6998(c); 7 C.F.R. § 11.10(b).

Upon reviewing the applicable regulations, this court disagrees with the hearing officer's conclusion that RMA lacks any authority to review an indemnity award. As discussed at length at the October 31, 2014 hearing when this court dismissed JOC's breach of contract claim against the insurance defendants, JOC was contractually barred from suing RCIS for breach of contract until JOC received a determination by the FCIC, through RMA, that "[RCIS], [RCIS's] agent or loss adjusted failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount less than the amount to which you were entitled." 7 C.F.R. § 457.8 (Section 20(i)); AR 772; see also [D.E. 2-4] (August 1, 2011 letter on behalf of RCIS to JOC denying a demand for additional indemnity in part because NAD did not find "that JOC was entitled to an additional payment"); [D.E. 2-8] (December 1, 2011 letter on behalf of RCIS to JOC denying a demand for additional indemnity because RMA "has not advised RCIS that its calculations were erroneous or that it underpaid the claim"). Thus, JOC is barred both by its contract and by the applicable regulations from asserting a claim based on an incorrect indemnity calculation until RMA determines that JOC has been underpaid. Moreover, RMA and RRO initially informed JOC that the agency had the authority under the Standard Reinsurance Agreement and applicable Manager's Bulletins to "participate in making loss determinations," and that RRO was "authorized to make large claim determinations on behalf of FCIC." AR 369. Accordingly, to the extent NAD concluded that RMA had no jurisdiction over this question, the conclusion conflicts with the applicable regulations and the statutory scheme. See, e.g., 7 C.F.R. § 457.8 (Section 20(i)). Even if private insurers make the final payment, RMA is not jurisdictionally precluded from reviewing

21

a private insurer's calculation to ensure that it complies with the terms of the policy. The applicable regulations specifically contemplate such a review. See id. Thus, RMA has jurisdiction to review the indemnity award. Indeed, a contrary holding would contravene the regulatory scheme and bar JOC from seeking any judicial remedy from RCIS for underpayment.

Given the traditional role of agency expertise and separation-of-power principles, this court is not suited to determine the indemnity JOC should receive. RMA is the proper entity to determine whether RCIS applied the proper methodology when calculating the indemnity amount. Thus, remand is appropriate.

Finally, on remand, the agency need not reconsider JOC's excess-precipitation claim because that finding is supported by substantial evidence in the record. The agency also need not reconsider JOC's argument that RCIS improperly remeasured its farm acreage because the court finds that RCIS had adequate reason to believe that JOC's reports were inaccurate to justify the decision to remeasure. See AR 688.

III.

In sum, the federal defendants' motion for summary judgment [D.E. 68] is DENIED. The case is REMANDED to the United States Department of Agriculture to determine whether there is evidence that JOC's 2009 tobacco crop suffered from plant disease, whether such plant disease, if any, entitles JOC to an additional indemnity amount, and whether RCIS applied the proper methods when calculating JOC's indemnity payment. In remanding, the court expresses no opinion as to the ultimate outcome. The court trusts, however, that the agency will act expeditiously concerning this long-pending claim. The clerk shall close the case.

SO ORDERED. This 17 day of September 2015.

JAMES C. DEVER III
Chief United States District Judge

22
Case 4:12-cv-00186-D   Document 80   Filed 09/17/15   Page 22 of 22